UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF  NEW YORK

_____

NINENA LUGO,

                              Plaintiff

-vs-

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                              Defendant.

_____

DECISION AND ORDER

11-CV-6028 CJS

APPEARANCES

For the Plaintiff:         Mark M. McDonald, Esq.
                           Bond, McDonald and Lehman, P.C.
                           91 Genesee Street
                           Geneva, New York 14456

For the Defendant:         Kathryn L. Smith, Esq.
                           United States Attorney's Office
                           100 State Street
                           Rochester, New York 14614

INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner" or "Defendant"),

which denied the application of Ninena Lugo ("Plaintiff") for Social Security

Supplemental Security Income disability benefits.  Now before the Court is Defendant's

motion [#4] for judgment on the pleadings and Plaintiff's cross-motion [#6] for judgment

on the pleadings.

1

PROCEDURAL HISTORY

Plaintiff maintains that she became unable to work on November 30, 2007. (115) When Plaintiff applied for benefits, she stated that the following conditions prevented her from working: Migraines, severe depression, and asthma. (115)  As for how those conditions prevented her from working, Plaintiff stated: "Most days I sit and cry for no reason.  I don't like to go out of the house.  I can not be around a lot of people.  I get nervous and sweat a lot and start crying." (115)  In addition to those ailments, Plaintiff now contends that she is disabled by anxiety/social phobia, shoulder pain, and back pain.

On June 27, 2008, Plaintiff protectively filed for SSI benefits. (106-08, 121).  On October 8, 2008, her application was initially denied. (68-71). She requested a hearing before an Administrative Law Judge ("ALJ") (Tr. 72-73), and on May 13, 2010, she appeared before the ALJ with her attorney (72-73, 35).  On July 16, 2010, the ALJ issued a decision finding Plaintiff not disabled. (21-29). Plaintiff requested review by the Appeals Council (5-16). On December 27, 2010, the Appeals Council denied Plaintiff's request for review.  Accordingly, the ALJ's decision is the final decision of the Commissioner (1-4).

VOCATIONAL HISTORY

Plaintiff completed high school and one year of college. (119)  Plaintiff's longest period of employment, lasting approximately one year, was as a deli worker in a supermarket, making pizza and salad, and cutting meats. (116)  Such work involved standing for eight hours per day, frequently lifting up to ten pounds, occasionally lifting up to twenty pounds, and handling and reaching. (116-117)   Plaintiff also worked as a

2

"Medical Counselor II," for about a year, working with persons with developmental disabilities. (116)  Plaintiff has also been employed as a retail customer service representative/cashier, a home health aide, and a cafeteria worker. (131-132).

In 2003, Plaintiff worked in a factory manufacturing batteries.[1]  Subsequently, Plaintiff worked for a few months as a "child care worker," but apparently left that job because it did not provide her with enough hours. (115)

Plaintiff did not leave any of her jobs due to her claimed impairments.  Instead, Plaintiff indicates that the onset of her disability occurred in November 2007, four years after she last worked at any job.

In the Spring of 2009, Plaintiff began taking classes to pursue a career in nursing.  However, in September 2009, Plaintiff reported that she had stopped taking classes, because she was distraught over being the victim of a crime some months earlier.

## ACTIVITIES OF DAILY LIVING

Plaintiff is able to care for herself and her three young children without assistance.  Plaintiff indicates that she does not leave the house much, and that friends visit her to socialize and watch television. (44)

## MEDICAL EVIDENCE

Plaintiff's medical history was summarized in the parties' submissions and need not be repeated here in its entirety.  It is sufficient for purposes of this Decision and Order to note the following facts.  Plaintiff's primary care providers are Dong Gi Hong,

---

[1] Plaintiff quit that job because she was pregnant and afraid that chemicals could harm her unborn child. (37-38, 116)

M.D. ("Hong") and nurse practitioner Rena Reed, MSNP ("Reed"), though she is mainly seen by Reed. (133)  Reed treats Plaintiff for asthma, allergies, anxiety, back and shoulder pain and depression. (134-135)  Plaintiff also sees neurologist Eugene Tolomeo, M.D. ("Tolomeo") for migraine headaches. (126)  Plaintiff has also seen orthopedists Daniel Alexander. M.D. ("Alexander") and David Cywinski, M.D. ("Cywinski")  for pain and dislocation in her left shoulder. (133)  Plaintiff has also been treated by therapist Eileen Ersteniuk, CSWR ("Ersteniuk"), psychiatrist Royle Miralles, M.D. ("Miralles") and nurse practitioner Lauren Morgan, NP, ("Morgan") at Wayne Behavioral Health Network for depression and anxiety. (139)

Plaintiff takes Albuterol and Flovent for asthma, Zyrtec for allergies, and Neurontin for anxiety. (134) Plaintiff also takes Tylenol #3 for back and shoulder pain and Topamax for headaches. (135)  Topamax is an anti-seizure medication that is used prophylactically to prevent migraine headaches from occurring.  Plaintiff also takes Naprosyn (Aleve), a nonsteroidal anti-inflammatory drug, when headaches occur, and Effexor for depression. (136)

On February 22, 2004, Plaintiff, who had given birth in June 2004, complained to Reed about headaches. (187-188)  Plaintiff reported that she had severe headaches during the pregnancy and was now having them again, with blurred vision and occasional nausea. (188)  Plaintiff also complained of pain in both ears. *Id.*  Reed's impression was acute sinusitis (sinus infection). *Id.*

On February 9, 2005, Plaintiff told Hong's office that her left shoulder had popped out of its socket the previous day, apparently while she was trying to prevent herself from falling. (186)

4

On February 27, 2006, Plaintiff had diagnostic testing of her lumbosacral spine, after she complained of pain resulting from a fall four days earlier. (227)  The testing was normal, with no degenerative disease or other problems observed. *Id*.

On March 27, 2007, Tolomeo examined Plaintiff in connection with her complaints about headaches. (283)  Tolomeo indicated that he had been "following" Plaintiff "for quite some time for headaches," and that he "had them under control during her last visit," the date of which is unclear. *Id*.  Plaintiff told Tolomeo that she was then having headaches every day, ranging in severity from 4/10 to 10/10. *Id*.   Plaintiff's mental status was normal. *Id*.  Tolomeo indicated that Plaintiff had "chronic migraine headaches," which were "tension type headaches." *Id*.  Because Plaintiff was pregnant, Tolomeo indicated that his treatment options were limited. *Id*.  However, he prescribed magnesium oxide to prevent headaches, and told Plaintiff that she could take Tylenol #3 for pain if needed. *Id*.

In August 2007 Plaintiff began receiving counseling for depression at Wayne Behavioral Network. (118)   On September 14, 2007, Ersteniuk conducted an assessment for services. (154-162)  At that time, Plaintiff was pregnant and due to give birth to her third child later that month. (155)  Plaintiff indicated that she never previously received any psychiatric treatment. (154)  Ersteniuk reported that Plaintiff had good communication skills. (158)  Ersteniuk further noted that Plaintiff was well groomed and calm, with appropriate affect, spontaneous speech, and focused thoughts. (160)  Plaintiff's mood was "anxious." *Id*.  Plaintiff's orientation, memory and concentration were intact, though her insight and judgment were limited. *Id*.   As for her

reason or goal for seeking treatment, Plaintiff stated that she was having problems with her boyfriend and wanted to learn how to communicate more effectively with him. (161) In that regard, she stated that she wanted to learn to control her anger and express her feelings. *Id*. Ersteniuk opined that Plaintiff had a total Global Assessment Functioning ("GAF") score of 55, based on depressed mood and moderate problems in social functioning. *Id*.

On October 25, 2007, Plaintiff told Reed that her headaches were "terrible." (182) Again, Reed's impression was "acute sinusitis" (sinus infection). *Id*. Reed noted that Celebrex did not appear to be helping, and she prescribed another medication. On October 30, 2007, Plaintiff had a CT scan of her head to attempt to determine the cause of her headaches. (223)  The CT scan was negative. *Id*.

On December 6, 2007, Miralles conducted a psychiatric assessment. (163-166). Plaintiff stated that she had felt depressed for 18 months, particularly near the end of her pregnancy. (163) After the birth of her third child in or about September 2007, Plaintiff stated that she had frequent crying spells and felt irritable and apathetic. *Id*. She stated that she had suicidal ideation in November 2007, and was experiencing anxiety. *Id*. Plaintiff stated that she felt stressed because her mother had been diagnosed with cancer, her boyfriend was depressed, and she did not feel that she was adequately caring for her children or boyfriend. *Id*. Plaintiff reported a history of physical and sexual abuse as a child. (164)  Plaintiff's grooming and hygiene were poor, but her mental functioning was normal, though she felt depressed. (165)  Plaintiff expressed fear of being alone, and stated that she had difficulty falling and staying asleep. *Id*. Miralles

prescribed Paxil and directed Plaintiff to continue therapy with Ersteniuk. (166)

On December 7, 2007, Morgan completed a Diagnostic Review form. (167-168)
Morgan indicated that Plaintiff's diagnosis was major depressive disorder, single episode.
(167)  Morgan noted that Plaintiff, who had a history of depression, was "struggling with
single parenting and trying to work on her relationship." (168)

On September 15, 2008, Plaintiff reported to Hong's office that her "migraines
[were] more frequent and worse when [she] has one." (179)

On September 26, 2008, Plaintiff was examined by Harbinder Toor, M.D. ("Toor"),
a non-treating consultative internist. (233-236)  Plaintiff told Toor that her chief complaint
was migraine headaches, though she also complained of depression and asthma. (233)
Plaintiff apparently did not complain of any problems with her shoulder or back, and Toor
reported that Plaintiff's physical examination was normal. (234-235)  For example, Toor
indicated that Plaintiff had full range of movement and full strength in all her extremities,
including full range of movement in her shoulders, and full flexion and rotary movement in
her lumbar spine. (235)  Additionally, the straight leg raising test was negative bilaterally.
Plaintiff told Toor that she was able to care for herself and her children and perform all
household chores. (234)  With regard to headaches, Plaintiff indicated that she had
"migraines since she was 15 years old," "every day." (233)  Plaintiff stated that the pain
was sometimes 10 out of 10, with nausea and sensitivity to light. *Id*.  Plaintiff reported
that she treated the headaches by taking medication and lying down. *Id*.  Toor opined
that Plaintiff's headaches "can interfere with her routine," and that she should avoid
irritants which could bother her asthma. (236)

On September 26, 2008, Plaintiff was given a psychiatric evaluation by Christine

Ransom, Ph.D. ("Ransom"), a non-treating consultative examiner. (237-240)  Plaintiff

reportedly told Ransom that she had been unable to work due to "severe depression."

(237)  Plaintiff indicated that her medical conditions consisted of "headaches and

asthma." (237)  Plaintiff complained of difficulty falling asleep, erratic appetite, crying

spells, irritability, and low energy. (238)  Plaintiff indicated that she spends most of her

time caring for her three children. (238)  Plaintiff complained of difficulty concentrating for

long periods.  Plaintiff stated that she became "anxious" around strangers, but denied any

"generalized anxiety, panic attacks, manic symptomatology, thought disorder, cognitive

symptoms and deficits." (238)  Upon examination, Ranson found that Plaintiff's thoughts

were "[c]oherent and goal directed with no evidence of hallucinations, delusions or

paranoia." (238)  Plaintiff's affect and speech were "moderately dysphoric." (238)

Plaintiff's attention, concentration, and memory were intact, her cognitive functioning was

average, and her insight and judgment were good. (239)  Ransom concluded that Plaintiff

could understand and follow simple directions, perform simple tasks, maintain attention

and concentration for simple tasks, and learn new simple tasks. (239)  Ransom indicated

that Plaintiff could have moderate difficulty performing complex tasks, relating adequately

with others, and dealing with stress. *Id*.  Ransom's impression was major depressive

disorder and social phobia, both "currently moderate," and her prognosis was "fair to

good with continued and further medication management." (239-240)

On October 3, 2008, E. Kamin ("Kamin"), a non-treating non-examining agency

review psychologist, completed a Psychiatric Review Technique form. (241-254)  Kamin

stated that Plaintiff would have mild restriction of her daily living activities, and moderate

difficulty in maintaining social functioning and concentration, persistence or pace. (251)

8

Kamin also completed a Mental Residual Functional Capacity Assessment (261-264), indicating that Plaintiff was moderately limited in the following areas: Understanding, remembering and carrying out detailed instructions; maintaining attention and concentration for extended periods; working around others without being distracted by them; completing a normal workday and workweek without interruptions from psychologically-based symptoms; social interaction; and setting realistic goals. (261-262) Kamin further stated that Plaintiff "is able to sustain a normal workday and work week; and maintain a consistent pace," though she might have difficulty dealing with supervisors, co-workers and the public. (263)

On October 3, 2008, J. Konecny ("Konecny"), a non-treating non-examining agency reviewer, completed a Physical Residual Functional Capacity Assessment. (255-260)  Konecny indicated that Plaintiff had the following physical ability:  Able to lift 25 pounds frequently and 50 pounds occasionally, able to sit, stand, and/or walk for six hours in an eight-hour workday, with unlimited ability to push and/or pull. (256)  Konecny further indicated that Plaintiff should avoid respiratory irritants. (258)  Konecny stated that Plaintiff's complaints concerning her headaches and the limitations that they imposed were only partially credible, based on her extensive activities of daily living. (259)

On October 17, 2008, Plaintiff informed Reed that she was awaiting an appointment to see Tolomeo for her headaches. (265)

In November 11, 2008, Plaintiff returned to see Tolomeo regarding headaches. (284)  Tolomeo reported that he had not seen Plaintiff for a year, during which time her headaches were apparently under control, but that, "her headaches have returned." *Id*. Plaintiff stated that she had headaches every day.  Significantly, though, she had not

been taking any medication to prevent the headaches, and she was treating them with only Tylenol and sleep. *Id*. Plaintiff's mental and physical condition appeared normal. *Id*. Tolomeo opined that Plaintiff's headaches were a combination of migraine and tension type headaches. *Id*. Tolomeo prescribed Topamax to prevent the headaches, and told Plaintiff that she could take naprosyn for pain as needed. *Id*.[2]

On February 20, 2009, Ersteniuk reported that Plaintiff was "doing ok" and taking Effexor. (267)  Plaintiff's mood was stable, her though process was logical, her insight, judgment and concentration were fair, and her attention and energy level were good. *Id*.

On May 12, 2009, Wayne Behavioral Health discharged Plaintiff for failing to keep appointments. (277)  Plaintiff reported that she had "returned to school for nursing," and was continuing to receive medication from her primary care physician. (278)  Ersteniuk further stated: "Client no showed and cancelled several  appts and no longer received medications at this clinic.  Client stable and returning to college." (279)

On September 1, 2009, Reed reported that Plaintiff was complaining of low back pain: "Also [complaining of] pain lower back started yesterday after daughter got her foot caught in mattress spring [and] Ninena had to hold her sitting on floor for 20-30 minutes." (320)  Reed's impression was "acute low back strain." *Id*.  On September 15, 2009, Plaintiff reported that her back was still painful. *Id*.  Several months later, Plaintiff reported that her back was "much better" with only an occasional spasm. (328)

On September 15, 2009, Ersteniuk reported that Plaintiff returned for further

---

[2]There is no indication that Plaintiff saw Tolomeo again.  Plaintiff did see Hong/Reed on several occasions after this in 2009 and 2010 (320-329), and it appears that she only complained of a headache on one occasion. (320).

counseling/therapy.  Plaintiff indicated that she had been doing well and taking online classes, but had become distraught about a crime that was committed against her two months earlier. (286)  Plaintiff stated that she had "quit school" and was "just sitting at home." *Id*.  Upon examination, Plaintiff was cooperative and calm, and had an appropriate affect, though she was sad and anxious. (295)  Plaintiff's thoughts were focused, and her orientation, memory, and concentration were intact. (296)  Ersteniuk noted that Plaintiff's insight was poor and her judgment was limited. *Id*.  Plaintiff reported being sad and having frequent crying spells. *Id*.  Plaintiff indicated that she was taking care of her three children full time and felt overwhelmed. *Id*.  Plaintiff stated that she was continuing to receive medications from her primary care physician. *Id*.  (At the hearing before the ALJ, Plaintiff stated that she was continuing to see her therapist, "[p]robably once every couple months." (40))

On January 4, 2010, Plaintiff told Reed that her left shoulder "popped out of [its] socket," and then "popped back in." (323)  Diagnostic testing of Plaintiff's left shoulder showed no evidence of dislocation or significant bony abnormality. (309)  Effat Jehan, M.D. ("Jehan") examined Plaintiff, and reported that Plaintiff said that the same shoulder had popped out of its socket "10 years ago," but that it had not happened "since then." (324)

On January 26, 2010, Ersteniuk reported that Plaintiff had "a new boyfriend in her life and her mood has improved." (305)

On January 27, 2010, Plaintiff told Reed that she'd had an asthma attack the previous night. (323)

On February 22, 2010, Plaintiff told Reed that her left shoulder had popped out and back in again, but the record does not indicate when this occurred. (328)  Plaintiff had full range of movement in the shoulder, with pain. (328)

On March 2, 2010, Reed noted in an office note that her impression was "chronic depression" and "chronic anxiety," though there is no indication that Plaintiff complained about either condition on that date. (329)  Reed noted that she had completed Plaintiff's disability paperwork, and that she intended to continue Plaintiff on antidepressants. *Id*.

On March 2, 2010, Hong completed a mental Residual Functional Capacity Assessment of Plaintiff. (312-315) Hong attributed Plaintiff's non-exertional limitations to two conditions: "chronic depression" and "chronic anxiety." (315)  The form report required Hong to rate Plaintiff's mental abilities as either "unlimited," "good," "fair" or "poor."  The report form defined "fair" as follows:  "The ability to function in this area is seriously limited and will result in periods of unsatisfactory performance at unpredictable times."  The report defined a "poor" rating to mean "No useful ability to function in this area." (312)  Hong indicated that Plaintiff had a fair ability to understand and carry out simple instructions, remember work procedures, remember detailed instructions, respond appropriately to supervision, respond appropriately to co-workers, exercise appropriate judgment, abide by occupational rules, make simple work-related decisions, and maintain social functioning. (312-314)  Hong stated that Plaintiff had only a poor ability to function independently on a job, concentrate over an 8-hour work period, be aware of normal hazards, and tolerate customary work pressures. (313-314)  Hong added that Plaintiff "does not tolerate pressure well," and would experience "increased anxiety" if placed under pressure. (314)  Hong also stated that Plaintiff would have "good days and bad

days," and would probably miss "more than four days per month" from work as a result of her impairments.

On March 2, 2010, orthopedic surgeon Alexander wrote a consultation report to Reed concerning Plaintiff's left shoulder.  Plaintiff reportedly told Alexander that she was a "chronic dislocator" since age sixteen, and that her "shoulder pops out all the time." (331)  Upon examination, Plaintiff's shoulder was tender, but had good strength (4/5) and range of motion. (331)  Alexander recommended obtaining an MRI and having Plaintiff perform exercises to increase strength and range of motion. (332)

On March 8, 2010, MRI testing was performed on Plaintiff's left shoulder. (310) The impression was "supraspinatus tendinopathy with minimal articular sided partial tear," and "abnormal signal at the anterior glenoid labrum consistent with injury from previous shoulder dislocation." *Id*.

On March 9, 2010, orthopedic specialist Cywinski examined Plaintiff and reviewed the MRI results with her. (333-334)  Plaintiff told Cywinski that her shoulder had popped out three times during the last three weeks. (333)  Cywinski observed that Plaintiff had "mild tenderness" in the shoulder. *Id*.  Cywinski recommended that Plaintiff pursue "aggressive physical therapy" for three-to-six months, and then consider surgery if the condition did not improve. *Id*.

On March 29, 2010, Hong completed a "Migraine Headache Questionnaire" for Plaintiff's counsel. (316-319)  Hong stated that Plaintiff's headaches occurred "every other day the whole day" (316), which is not consistent with Plaintiff's hearing testimony or Tolomeo's notes.  Hong indicated that Plaintiff's pain was "moderate," meaning that it "inhibits but does not wholly prevent usual activity." *Id*.  Hong checked boxes on the form

indicating that Plaintiff's headaches would cause "significant interference with activity," and would be painful enough to interfere with her attention and concentration needed to perform simple tasks. (317)  The form asked Hong to answer several questions about Plaintiff's treatment regimen, including whether her headaches were controlled by medication, and whether her complaints were consistent with Hong's diagnosis. However, Hong left that portion of the report blank. (318)

## STANDARDS OF LAW

42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."  The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard."  *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.*

For purposes of the Social Security Act, disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Schaal*, 134 F.3d at 501.

> The SSA has promulgated administrative regulations for determining when a claimant meets this definition.  First, the SSA considers whether the claimant is currently engaged in substantial gainful employment.  If not, then the SSA considers whether the claimant has a "severe impairment" that significantly limits the "ability to do basic work activities.  If the claimant does suffer such an impairment, then the SSA determines whether this impairment is one of those listed in Appendix 1 of the regulations.  If the claimant's impairment is one of those listed, the SSA will presume the claimant to be disabled.  If the impairment is not so listed, then the SSA must determine whether the claimant possesses the

14

"residual functional capacity" to perform his or her past relevant work.  Finally, if the claimant is unable to perform his or her past relevant work, then the burden shifts to the SSA to prove that the claimant is capable of performing "any other work."

*Schaal*, 134 F.3d at 501 (Citations omitted).

At step five of the five-step analysis above, the Commissioner may carry his burden by resorting to the Medical Vocational Guidelines or "grids" found at 20 C.F.R. Pt. 404, Subpart P, Appendix 2. *Pratts v. Chater*, 94 F.3d 34, 38-39 (2d Cir. 1996)(citation omitted); *see also*, SSR 83-10 (Stating that in the grids, "the only impairment-caused limitations considered in each rule are exertional limitations.")  However, if a claimant has nonexertional impairments which "significantly limit the range of work permitted by his exertional limitations," then the Commissioner cannot rely upon the grids, and instead "must introduce the testimony of a vocational expert ["(VE")](or other similar evidence) that jobs exist in the economy which claimant can obtain or perform."[3] *Pratts v. Chater*, 94 F.3d at 39; *see also*, 20 C.F.R. § 416.969a(d)[4]; see also, *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986) ("If the guidelines adequately reflect a claimant's condition, then their use to determine disability status is appropriate. But if a claimant's nonexertional

---

[3]"Exertional limitations" are those which affect an applicant's ability to meet the strength demands of jobs, such as sitting, standing, walking, lifting, carrying, pushing, and pulling. 20 C.F.R. § 416.969a(a). "Non-exertional limitations" are those which affect an applicant's ability to meet job demands other than strength demands, such as anxiety, depression, inability to concentrate, inability to understand, inability to remember, inability to tolerate dust or fumes, as well as manipulative or postural limitations, such as the inability to reach, handle, stoop, climb, crawl, or crouch. 20 C.F.R. 416.969a(c).

[4]20 C.F.R. § 416.969(d) provides, in relevant part, that, "[w]hen the limitations and restrictions imposed by your impairment(s) and related symptoms, such as pain, affect your ability to meet both the strength [exertional] and demands of jobs other than the strength demands [nonexertional], we consider that you have a combination of exertional and nonexertional limitations or restrictions. . . . [W]e will not directly apply the rules in appendix 2 [the grids] unless there is a rule that directs a conclusion that you are disabled based upon your strength limitations; otherwise the rule provides a framework to guide our decision."

impairments significantly limit the range of work permitted by his exertional limitations then the grids obviously will not accurately determine disability status because they fail to take into account claimant's nonexertional impairments.") (citation and internal quotation marks omitted).  More specifically,

> where the claimant's work capacity is significantly diminished beyond that caused by his exertional impairment the application of the grids is inappropriate.  A claimant's work capacity is "significantly diminished" if there is an additional loss of work capacity that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity.

*Pratts v. Chater*, 94 F.3d at 39 (citations and internal quotation marks omitted).  Put another way, a claimant's work capacity is "significantly diminished" if the nonexertional impairments cause "the additional loss of work capacity *beyond a negligible one*." *Bapp v. Bowen*, 802 F.3d at 606 (emphasis added).  The term "negligible" is defined as "so insignificant as to be unworthy of consideration." Webster's II New College Dictionary (Houghton Mifflin Co. 1995).

Under the regulations, a treating physician's opinion is entitled to controlling weight, provided that it is well-supported in the record:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 416.927(d)(2); 20 C.F.R. § 404.1527(d)(2).  However, "[w]hen other substantial evidence in the record conflicts with the treating physician's opinion . . .  that opinion will not be deemed controlling.   And the less consistent that opinion is with the

16

record as a whole, the less weight it will be given." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)(*citing* 20 C.F.R. § 404.1527(d)(4)).  Nevertheless,

> [a]n ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion. 20 C.F.R. § 404.1527(d)(2). Among those factors are: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion. *Id*. The regulations also specify that the Commissioner 'will always give good reasons in [her] notice of determination or decision for the weight [she] give[s] [claimant's] treating source's opinion.' *Id*.; *accord* 20 C.F.R. § 416.927(d)(2); *see also Schaal*, 134 F.3d at 503-504 (stating that the Commissioner must provide a claimant with "good reasons" for the lack of weight attributed to a treating physician's opinion).

*Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).

Administrative Law Judges are required to evaluate a claimant's credibility concerning pain according to the factors set forth in 20 C.F.R. § 404.1529, which states in relevant part:

> In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.  By objective medical evidence, we mean medical signs and laboratory findings as defined in § 404.1528 (b) and (c). By other evidence, we mean the kinds of evidence described in §§ 404.1512(b) (2) through (6) and 404.1513(b) (1), (4), and (5) and (e). These include statements or reports from you, your treating or examining physician or psychologist, and others about your medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how your impairment(s) and any related symptoms affect your ability to work. We will consider all of your statements about your symptoms, such as pain, and any description you, your physician, your psychologist, or other persons may provide about how the symptoms affect your activities of daily living and your ability to work.

                                        ***

In evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings and statements about how your symptoms affect you. (Section 404.1527 explains how we consider opinions of your treating source and other medical opinions on the existence and severity of your symptoms, such as pain.) We will then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work.

20 C.F.R. § 404.1529(a); 20 C.F.R. § 416.929(a).  The regulation further states, in

relevant part:

Factors relevant to your symptoms, such as pain, which we will consider include:
(i) Your daily activities;
(ii) The location, duration, frequency, and intensity of your pain or other symptoms;
(iii) Precipitating and aggravating factors;
(iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3); 20 C.F.R. § 416.929(c)(3).

THE ALJ'S DECISION

On July 16, 2010, the ALJ issued the decision that is the subject of this action. (21-

29).

At the first step of the five-step sequential analysis described above, the ALJ found

that Plaintiff had not engaged in substantial gainful employment since June 27, 2008, the

application date. (23)

18

At the second step of the analysis, the ALJ found that Plaintiff had the following severe impairments: "History of asthma, chronic migraine-type headaches and Major depressive disorder, single episode." (23).  On the other hand, the ALJ found that Plaintiff's "other medical conditions, including recurrent dislocating left should[er] and contusion of the foot," were not severe, because, "[i]n most cases, these conditions have responded to treatment and/or have not caused more than minimal functional limitations." (23)

At step three of the five-step analysis, the ALJ found that Plaintiff did not have a listed impairment. (23-24).  In making this finding, the ALJ observed that Plaintiff had only mild restriction in her activities of daily living, and moderate difficulties with regard to social functioning and maintaining concentration, persistence or pace. (23)

At step four of the five-step analysis, the ALJ found that Plaintiff could perform her past relevant work, as a factory worker and dietary aide," "which were unskilled jobs with simple tasks." (28)  The ALJ based this determination on his RFC assessment, which was that Plaintiff could perform "light work," with the following limitations: "simple tasks in which the claimant would not work closely with people, and should avoid fumes, dust and respiratory irritants." (24)  In this regard, the ALJ observed that Plaintiff's asthma was controlled with medication, though she still needed to avoid irritants. (24)  As for Plaintiff's headaches, the ALJ noted that they seemed to well controlled with medication at times, although they worsened when Plaintiff was pregnant. (24)  The ALJ further stated that Plaintiff was prescribed Topomax for general control of the headaches, and Naprosyn for acute episodes. With regard to Plaintiff's depression and anxiety, the ALJ found that Plaintiff could nevertheless follow and understand simple directions, perform simple tasks

19

independently, maintain attention and concentration, maintain a simple schedule, and learn simple new tasks. (26)

In making this RFC assessment, the ALJ gave "substantial weight" to the opinions of Toor and Ransom. (26)  The ALJ also appears to have relied on Tolemeo's notes to a significant degree.  However, because Tolomeo provided only "minimal opinions as to functional limitations," the ALJ indicated that his notes were "primarily useful as providing medical history for this impairment." *Id*.

As for the opinions of Hong and Reed, the ALJ found that they were "seriously flawed as controlling medical evidence," for several reasons, and he gave them only "limited weight." (27)  For example, the ALJ noted that the Migraine Headache Questionnaire was incomplete, and failed to include opinions concerning the effect of stress on Plaintiff's ability to work and the effectiveness of treatments. (318)  Hong's and Reed's reports also failed to indicate how often Plaintiff might need to be alone in a dark room because of headache pain. (26-27)  The ALJ further noted that Hong's/Reed's notes/reports fail to mention Tolomeo's involvement in Plaintiff's treatment, and were inconsistent with Toleomeo's notes, since Hong's/Reed's reports indicate that Plaintiff got headaches every other day, while Tolomeo's notes indicate that Plaintiff claimed to get them every day. (27)  The ALJ additionally considered that neither Hong nor Reed specializes in psychiatry.

The ALJ also stated that the record did not reflect "any treatment or medication prescribed" by Hong or Reed for Plaintiff's depression or anxiety.  That observation is not entirely correct, however.  On December 8, 2004, Reed noted that Plaintiff was complaining of "mood swings - labile," and she prescribed Wellbutrin. (188)  Moreover, on

March 2, 2010, Reed stated that she would "continue antidepressants." (329)  However, the ALJ was correct that Hong's and Reed's notes are otherwise devoid of any mention of those conditions.

The ALJ observed that Hong had been treating Plaintiff since 2002, and that his and Reed's notes confirmed that they had been treating Plaintiff for depression, insomnia, migraine headaches, asthma, and depression, for which they had prescribed various medications. (26)  Nevertheless, the ALJ concluded that Hong's and Reed's were "not consistent with other substantial evidence of record, including evidence from Wayne Behavioral Network and the opinions of consultative examiners [Toor and Ransom]." (27)

In considering the evidence from Hong and Reed, the ALJ mistakenly interpreted one of their responses on the Migraine Headache Questionnaire. (27)  The questionnaire asked: "Have the above limitations been reasonably consistent and continuing since 1/01/07?"  Hong and Reed answered "yes," but the ALJ misunderstood the question mark in the question as being part of their response, and as indicating some uncertainty on their part. *Id*. ("[T]he question mark following the beginning of symptoms (1/01/07?) suggests that these treating sources are not certain about details of the claimant's impairments.")  This was an error by the ALJ.

In any event, based on his RFC finding, the ALJ found, at step four of the five-step sequential analysis, that Plaintiff could perform her past relevant work as a factory worker and dietary aide. (27-28)  The ALJ stated that those jobs were "unskilled jobs with simple tasks," which did not require "significant interaction with others or an exertional level in excess of light work." (28)

Alternatively, the ALJ found, at step five of the sequential analysis, that Plaintiff

could perform other jobs. (28)  In that regard, the ALJ used the grids as a framework, and

found that "[c]onsidering the claimant's age, education, work experience, and [RFC],

there are jobs that exist in significant numbers in the national economy that the claimant

can perform." *Id*.  The ALJ stated that although Plaintiff could not perform the full range of

light work, her additional limitations would "have minimal effect on the occupational base

of unskilled light work." *Id*.  Accordingly, the ALJ found that Plaintiff had not been under a

disability at any time since filing her application, and that she was not entitled to benefits.

(28-29)

ANALYSIS

*The ALJ's Severity Determination*

Plaintiff maintains that her shoulder pain, back pain, and  "anxiety/social phobia"

are severe impairments, which the ALJ erroneously failed to classify as such.  As

discussed above, a condition is a "severe impairment" when it "significantly limit[s] [the]

physical or mental ability to do basic work activities." *See*, 20 C.F.R. § 404.1521 (giving

examples of basic work activities).  Put another way, "an impairment that is 'not severe'

must be a slight abnormality (or a combination of slight abnormalities) that has no more

than a minimal effect on the ability to do basic work activities." SSR 96-39, 1996 WL

374181 (S.S.A.).

Here, the Court finds that the ALJ's severity determination is supported by

substantial evidence and did not involve legal error.  At the outset, the Court does not

agree that the ALJ considered Plaintiff's anxiety/social phobia to be non-severe.  On this

point, the ALJ included her social phobia under the label of "depression and anxiety,"

and discussed it when making his RFC assessment. (24) ("At the Wayne Behavioral Health Network, the claimant had a diagnosis of Major Depressive Disorder, single episode, mild, and she was also being treated for symptoms of social phobia."); see also, id. (Referring to Plaintiff's "chronic depression and anxiety"). In addition, the ALJ found that Plaintiff's non-exertional limitations were affected by her anxiety/social phobia, which is why he included a limitation in her RFC restricting her from "working closely with people."

As for Plaintiff's left shoulder pain and lower back pain, the ALJ found that those conditions were not severe, because they responded to treatment and/or did not cause more than minimal functional limitations. (23)  With regard to plaintiff's back pain, the Court finds that such determination was clearly correct, since Plaintiff does not appear to have any serious or chronic condition affecting her back.  Instead, it appears that Plaintiff merely experienced a muscle strain in her back on one occasion.[5]  Plaintiff's shoulder condition is more significant, but there is still no indication that it would significantly limit her ability to work.  More specifically, the condition only affected Plaintiff's left shoulder, while she is right handed.  Furthermore, even when Plaintiff's shoulder would pop out, it would immediately pop back, leaving only residual pain and tenderness, but full range of motion and strength.  Plaintiff did not present any evidence that this condition caused her to experience any work-related restriction.

---

[5]According to the record, Plaintiff's back pain was limited to a single incident when she strained her back while sitting on the floor with a child.  Reed indicated that Plaintiff should not lift more than ten pounds, but this appears to have been a very temporary limitation. (320)

*The Treating Physician Rule*

Plaintiff further contends that the ALJ misapplied the treating physician rule.  First, Plaintiff maintains that even if the ALJ correctly decided to give controlling weight to the opinions of Toor and Ransom, he was therefore obligated to include all of the limitations that they identified in his RFC determination.  On this issue, Plaintiff argues that because Ransom indicated that her evaluation was consistent with Plaintiff's allegations, the ALJ therefore had to include every one of Plaintiff's subjective complaints in his RFC determination. Pl. Memo of Law at p. 11.  However, the Court disagrees, and finds that the ALJ's RFC determination accurately reflects the limitations described by Toor and Ransom.

Alternatively, Plaintiff contends that even if the ALJ correctly decided not to give controlling weight to the opinions of Hong and Reed, that he nevertheless failed to explain the weight that he was giving them.[6]  Specifically, Plaintiff maintains, correctly, that the ALJ was required to "consider" the factors set forth in 20 C.F.R. § 404.1527(d)(2), and give good reasons for his decision.  However, the Court believes that the ALJ did so.  In that regard, the ALJ expressly stated that he had considered the opinion evidence in accordance with 20 C.F.R. § 416.927, which is the equivalent regulation for weighing medical evidence in applications for SSI benefits, as well as SSR 96-2p. (24, 27).  The subject regulation, 20 C.F.R. § 416.927(d)(2), lists the factors to be considered when an ALJ decides not to give controlling weight to a treating physician's

---

[6]At oral argument, Plaintiff's counsel stated that he did not necessarily disagree with the ALJ's decision not to give controlling weight to the opinions of Hong and Reed, but he maintained that the ALJ did not properly explain what weight he gave them.

24

opinion, and these include: 1) the length of the treatment relationship; 2) the nature and extent of the treatment relationship; 3) supportability; 4) consistency; and 5) specialization. "  Although the ALJ is required to consider these factors, "[t]he fact that the ALJ did not specifically discuss all of the factors set forth in 20 CFR § 404.1527(d)(2) does not require reversal." *Hutton v. Astrue*, No. 09-CV-6026 CJS, 2010 WL 1707521 at *12 (W.D.N.Y. Apr. 26, 2010) (citing *Terreri v. Astrue*, No. 07-CV-277-JTC, 2009 WL 749860 at * 5-6 (W.D.N.Y. Mar.18, 2009), *aff'd*, 368 Fed.Appx. 204, 2010 WL 726726 at *1 (2d Cir. Mar 3, 2010)).  Here, it is evident that the ALJ considered the relevant factors and provided good reasons for why he gave Hong's and Reed's opinions only "limited weight."

Plaintiff nevertheless contends that the ALJ erred in evaluating Hong's and Reed's opinions in various respects. *See*, Pl. Memo of Law at pp. 11-12.  Specifically, Plaintiff contends that the ALJ improperly "disregarded" the Headache Questionnaire because it was incomplete, when he should have instead requested the missing information from Hong.  The ALJ's decision, though, indicates that he did not disregard the subject reports, even though he did give them limited weight.  Although the ALJ mentioned that certain parts of the forms were left blank, he discussed the information that was provided. (26-27)  Moreover, it seems unlikely that Hong's and Reed's failure to complete an entire page of the report was inadvertent.  That is, presumably both Hong and Reed reviewed the form before signing it, and it is unlikely that both of them would have failed to notice that they were leaving a page blank.  On the other hand, since Plaintiff was being seen by Tolomeo specifically for treatment of her headaches, it seems more likely that Hong

and Reed were deferring to Tolomeo's opinion concerning Plaintiff's treatment.

Plaintiff further maintains that the ALJ misinterpreted Hong's/Reed's use of the term "fair" in their description of Plaintiff's nonexertional limitations. Pl. Memo of Law at p. 12; see also (27).  With respect to this argument, Plaintiff contends that the ALJ gave that term a more-favorable meaning than Hong and Reed intended.  The Court disagrees. Plaintiff further indicates that the ALJ failed to give sufficient reasons for rejecting Hong's and Reed's opinion that Plaintiff had only a "poor" ability to function independently at work, complete a normal workday, maintain concentration, be aware of normal hazards, and tolerate stress. Pl. Memo of Law at p. 12; see also (27, 313-314) Again, however, the Court disagrees. *See*, ALJ's Decision (26-27).  The Court further notes that Hong's and Reed's observations on these points are not supported by their office notes.  Further, Hong's statement, that Plaintiff had a "history of missing 4-5 days per month when she did work" (315), in addition to being unsupported, seems irrelevant since Plaintiff maintains that the onset of her disability occurred years after she had already stopped working.  Plaintiff has not provided any evidence that when she was working, she missed work due to any of her claimed impairments.

Plaintiff also maintains that the ALJ erred when assessing her credibility.  On this point, Plaintiff states that it "appears" that the ALJ made a negative credibility determination because Plaintiff "did not have continuous treatment for her depressive symptoms." Pl. Memo of Law at p. 15.  Plaintiff contends that the ALJ erred in this regard, thereby violating SSR 96-7p, because he did not inquire about why Plaintiff did not seek continuous treatment. *Id*.  In this regard, SSR 96-7p states, in pertinent part:

[T]he individual's statements may be less credible if the level or frequency

of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure. However, the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.

1996 WL 374186 at *7 (S.S.A. 1996).  Here, the ALJ noted that Plaintiff began treating at Wayne Behavioral Health in 2007, was terminated from treatment in May 2009 "due to non-compliance for excessive cancellation of appointments," and then re-started treatment iin 2010. (24)  However, the ALJ did not indicate that he was drawing any negative inference from the fact that Plaintiff's treatment was interrupted due to her non-compliance.  Accordingly, the Court does not agree that the ALJ violated SSR 96-7p.

### Plaintiff's Past Relevant Work

Plaintiff maintains that the ALJ erred in finding that she could perform her past relevant work.  Defendant disagrees, but does not actively dispute this point, and contends that any such error would be harmless, since the ALJ correctly made an alternative finding, at step five, that Plaintiff could perform other work.

### Whether Plaintiff Can Perform Other Work

At step five of the analysis, the ALJ used the grids as a framework to find that Plaintiff could perform other work.  In that regard, the ALJ stated that Plaintiff was generally capable of performing a full range of light work, and that her additional limitations would have only a "minimal effect on the occupational base of unskilled light work." (28)  However, Plaintiff disagrees with that assessment, and maintains that her limitations are serious enough that the ALJ was required to call a VE to testify as to

whether she could perform other work.  More specifically, at oral argument, Plaintiff

indicated that the evidence, including Ransom's report,[7] which the ALJ gave "substantial

weight," and the Psychiatric Review Technique,[8] indicate that she has "moderate"

limitations, which therefore requires evidence from a VE.  In support of her position,

Plaintiff relies on *Baldwin v. Astrue*, No. 07 Civ. 6958(RJH)(MHD), 2009 WL 4931363

(S.D.N.Y. Dec. 21, 2009) ("*Baldwin*") and *Zwick v. Apfel*, No. 97 Civ. 5140(JGK),1998 WL

426800 (S.D.N.Y. Jul. 27, 1998) ("*Zwick*").  In *Baldwin*, the court found that the ALJ erred

by failing to call a VE at step five of the five-step analysis, where a consulting physician

had indicated that the claimant had moderate limitations "in numerous areas that bear on

activities of daily living and social functioning." *Baldwin*, 2009 WL 4931363 at *28.

Similarly, in *Zwick*, the court found that the ALJ erred by failing to call a VE, where the

claimant's mental impairments had resulted in "moderate limitations" of her activities of

daily living and social functioning." *Zwick*, 1998 WL 426800 at *8; but see, *Wallis v.

Commissioner of Social Security*, No. 09-CV-1075 (TJM/VEB), 2010 WL 3808303 at *12

(N.D.N.Y. Aug. 5, 2010) ("Although there is some evidence of mild or moderate

limitations imposed by Plaintiff's mental impairments, there is no indication that those

limitations so narrow Plaintiff's possible range of work so as to deprive her of a

meaningful employment opportunity.") (Report and Recommendation adopted by 2010

WL 3806824 (N.D.N.Y. Sep. 22, 2010)).

Of course, "application of the grid guidelines and the necessity for expert

---

[7]Ransom stated that Plaintiff would have moderate difficulty with complex tasks, relating with others and handling stress. (239)

[8]The Psychiatric Review Technique Form stated that Plaintiff would have moderate difficulty with maintaining social functioning and concentration, persistence or pace. (251)

testimony must be determined on a case-by-case basis." *Bapp v. Bowen*, 802 F.2d at

605.  Here, the ALJ did not explain his decision not to call a VE, except to say that, "the

additional limitations, described above, have minimal effect on the occupational base of

unskilled light work." (28)  However, it seems likely that the nonexertional limitations

identified by Ransom, Kamin, and others would have more than a negligible effect on

Plaintiff's ability to perform the full range of light work.  In that regard, the Commissioner

has given examples of certain nonexertional impairments that are likely to have only a

negligible impact on a claimant's ability to perform light work:

> [T]here are nonexertional limitations or restrictions which have very little or
> no effect on the unskilled light occupational base. Examples are inability to
> ascend or descend scaffolding, poles, and ropes; inability to crawl on hands
> and knees; and inability to use the finger tips to sense the temperature or
> texture of an object. Environmental restrictions, such as the need to avoid
> exposure to feathers, would also not significantly affect the potential
> unskilled light occupational base.

SSR 83-14, 1983 WL 31254 at *5 (S.S.A. 1983).  For such limitations, an ALJ would not

be required to call a VE.  On the other hand, the Commissioner has indicated that "a

visual impairment[9] which is not of Listing severity" could likely significantly limit the

occupational base for light work. *Id*.  For such a limitation, the ALJ would be required to

call a VE.  Here, Plaintiff's mental impairments fall somewhere between these two groups

of examples, and in that situation, the Commissioner indicates that an ALJ "will often

require the assistance of a [VE]." *Id*.  Accordingly, the Court finds that remand is

appropriate to allow the ALJ to obtain evidence from a VE.

---

[9]Visual impairments are considered to be non-exertional limitations.

CONCLUSION

For the reasons set forth above, Defendant's motion for judgment on the pleadings [#4] is denied, Plaintiff's cross-motion for judgment on the pleadings [#6] is granted, and this matter is remanded to the Commissioner for further administrative proceedings pursuant to 42 U.S.C. § 405(g), sentence four.  The Clerk of the Court is directed to close this action.

So Ordered.

Dated: Rochester, New York
        March 20, 2012

ENTER:


/s/ Charles J. Siragusa_____
CHARLES J. SIRAGUSA
United States District Judge